FILED & ENTERED

APR 04 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fisherl     DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>Brenda Lou Fisher,<br><br>               Debtor.<br><br>―――――――――――――――<br>Gina Nuccio Gomez, RSA Productions LLC, and RSA Talent Management LLC,<br><br>               Plaintiffs,<br><br>    v.<br><br>Brenda Lou Fisher,<br><br>               Defendant. | Case No.: 1:23-bk-11223-VK<br><br>Chapter 7<br><br>Adv. No.: 1:23-ap-01049-VK<br><br>**MEMORANDUM OF DECISION AFTER TRIAL** |

On February 25 and February 26, 2025, the Court conducted a trial in the above-captioned adversary proceeding. John C. Clough of Buchalter, a Professional Corporation, appeared on behalf of plaintiffs Gina Nuccio Gomez, RSA Talent Management LLC and RSA Productions LLC. Sevan Gorginian appeared on behalf of defendant Brenda Lou Fisher.

-1-

The Court has jurisdiction over the adversary proceeding commenced by the filing of plaintiffs' *First Amended Complaint* [doc. 19]. The matter in controversy is a core proceeding. Venue is proper pursuant to 28 U.S.C. § 1409.

For the reasons set forth below, the Court will enter judgment in favor of Brenda Lou Fisher under 11 U.S.C. § 523(a)(6). This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.

# I.    BACKGROUND

## A.    The Parties' Business Relationship Begins

Brenda Lou Fisher ("Defendant") is a talent manager, producer and director with experience in marketing and sales. *Declaration of Brenda L. Fisher ("Fisher Decl.")*, ¶ 3 [doc. 48].1 Gina Nuccio Gomez is a talent manager who, prior to her business relationship with Defendant, had been managing talent on a small scale. *Id.*, ¶ 4.

Defendant and Ms. Gomez met when their children appeared in a short film together. *Id.* Ms. Gomez had seen advice Defendant had given to other parents on Facebook. *Id.* In February 2014, Ms. Gomez approached Defendant and proposed that they become business partners. *Id.*; *Deposition of Brenda Fisher ("Fisher Dep.")*, p. 128 [Ex. 3].

### 1.    Formation of RSA Talent

On May 29, 2015, Ms. Gomez and Defendant formed RSA Talent Management, LLC ("RSA Talent") by filing articles of organization with the California Secretary of State. RSA Talent Articles of Organization, p. 10 [Ex. A]. RSA Talent was formed to work with entertainers and creatives in all media, e.g., social media, film, television, podcasts and radio. Second Amended Pre-Trial Stipulation ("Pretrial Stip."), Section I, ¶ 1 [doc. 42].

On May 29, 2015, Ms. Gomez and Defendant executed an operating agreement concerning RSA Talent (the "RSA Talent Operating Agreement"). RSA Talent Operating Agreement, pp. 5-21 [Ex. 1]. Ms. Gomez drafted the RSA Talent Operating Agreement. Fisher

---

[1] The Court may take judicial notice of the bankruptcy case and adversary proceeding dockets. The facts are derived from testimony at trial and/or when so cited, from a pleading from these dockets, admitted testimony from trial declarations and exhibits admitted at trial.

Decl., ¶ 7 [doc. 48]. The RSA Talent Operating Agreement provides that Ms. Gomez and Defendant were each a member of RSA Talent with a 50% membership interest. RSA Talent Operating Agreement, Section III.A, at p. 6 [Ex. 1]. The RSA Talent Operating Agreement further states, in relevant part:

> State of Formation. This is a Limited Liability Company Operating Agreement...for RSA Talent Management, a Manager-managed California limited liability company..., formed under and pursuant to California law.
>
> Loyalty and Care. Except to the extent otherwise provided herein, each Manager and Officer shall have a fiduciary duty of loyalty and care similar to that of managers of business corporations organized under the laws of California.
>
> Competition with [RSA Talent]. The Managers and Officers[2] shall refrain from dealing with [RSA Talent] in the conduct of [RSA Talent]'s business as or on behalf of a party having an interest adverse to [RSA Talent] unless a majority, by individual vote, of the Board of Managers, excluding the interested Manager, consents thereto. The Managers and Officers shall refrain from competing with [RSA Talent] in the conduct of [RSA Talent]'s business unless a majority, by individual vote, of the Board of Managers excluding the interested Manager, consents thereto.
>
> Duties Only to [RSA Talent]. The Managers' and Officers' fiduciary duties of loyalty and care are to the Company and not to the other Managers or other Officers. The Managers and Officers shall owe fiduciary duties of disclosure, good faith and fair dealing to [RSA Talent] and to the other Managers, but shall owe no duties to Officers unless the Officer is a Manager.

*Id.*, Sections I.A, VIII.A-VIII.C, at pp. 5, 15; *Pretrial Stip.*, Section I, ¶¶ 3-6.

Before September 2022, Defendant and Ms. Gomez were both "managers" of RSA Talent as that term is defined in the RSA Talent Operating Agreement.[3] According to Ms. Gomez, she has been the sole officer of RSA Talent at all relevant times; that is, she is the chairman, secretary and treasurer of RSA Talent. *See RSA Talent Operating Agreement*, Section VII.A, at p. 13 [Ex. 1].

---

[2] "Officers" consist of a Chairman, a Secretary and a Treasurer. *Id.*, Section VII.A, at p. 13.

[3] The RSA Talent Operating Agreement provides for the members of RSA talent to appoint managers to a board of managers. *Id.*, Section VI.A, at p. 9. Members may serve as managers. *Id.*

### 2.    *Formation of RSA Productions*

On July 28, 2021, Ms. Gomez formed RSA Productions, LLC ("RSA Productions," and together with RSA Talent, "RSA") by filing articles of organization with the California Secretary of State. *RSA Productions Articles of Organization*, p. 15 [Ex. B]. RSA Productions is a manager-managed LLC. *Id.*, p. 5. On July 29, 2021, Ms. Gomez and Defendant executed an operating agreement concerning RSA Productions (the "RSA Productions Operating Agreement"). *RSA Productions Operating Agreement*, pp. 23-33 [Ex. 2]. Ms. Gomez drafted the RSA Productions Operating Agreement. *Fisher Decl.*, ¶ 7. The RSA Productions Operating Agreement states that Ms. Gomez and Defendant were each a member of RSA Productions with a 50% membership interest. *RSA Productions Operating Agreement*, p. 23 [Ex. 2].

RSA Productions was created for Ms. Gomez and Defendant's new business venture into entertainment productions, including podcasts and voice over recordings. Ms. Gomez and Defendant equally contributed to RSA Productions in order to acquire voiceover equipment worth approximately $10,000. *Fisher Dep.*, pp. 148-50; *Fisher Decl.*, ¶ 50.

### B.    *RSA's Operations Before September 2022*

### 1.    *Management*

RSA maintains an office at 1000 North Reese Place, Burbank, California, 91506 (the "RSA Office"). RSA provides talent management and talent agent services to its clients, who are primarily aspiring screen actors.[4] As a talent agency, RSA procures employment for clients by submitting them for auditions and casting calls. RSA performed its work as a talent agency through Defendant and Ms. Gomez, with the assistance of Allison Schultz, Paula Swain and

---

[4] Regarding the role of a talent manager versus that of a talent agent:

> Agents and managers represent artists, and their collective role in the entertainment industry is straightforward. ... To be more specific, agents procure employment for talent. Their job is to get the artists they represent as much work as possible. Managers, on the other hand, shape artists' careers. Their job is to serve their clients in an advisory capacity and to counsel them on the career options that have been made available to them through their agents. When looked at this way, things seem very black-and-white: Agents present artists with employment opportunities, and managers suggest which of those opportunities artists should accept.

David Zelenski, *Note: Talent Agents, Personal Managers, and Their Conflicts in the New Hollywood*, 76 Univ. S. Cal. L. Rev. 979, 979-80 (2003) (internal citations omitted).

Vanessa Gilbert. Ms. Schultz and Ms. Swain worked primarily with on-screen talent; Ms. Gilbert worked primarily with voiceover talent. *Fisher Dep.*, p. 179-80.

Ms. Gomez and Defendant each were a talent manager for clients at RSA. Each had her own roster of clients whom they personally managed. Under normal circumstances, clients communicated primarily with their assigned talent manager.

### 2.    *Contracting with Clients*

To ensure RSA was paid the commissions owed to it, RSA executed talent management contracts with each new client. *Fisher Decl.*, ¶ 8. Ms. Gomez created the contracts. *Id*. Defendant and Ms. Gomez both signed each of these contracts on behalf of RSA. *See Talent Management Contract for Dalen W. Carlson dated July 15, 2022*, pp. 136-140 [Ex. 12 to Fisher Dep.]; *Talent Management Contract for Alfonso Faustino dated February 18, 2022*, pp.141-45 [Ex. 13 to Fisher Dep.].

According to Defendant, these contracts did not bind a client to RSA's representation for a set amount of time. *Fisher Decl.*, ¶ 8. During signing appointments with clients, either Defendant or Ms. Gomez would verbally explain to a client that they could terminate RSA's representation at their discretion. *Id.*, ¶ 9.

### 3.    *Finances*

RSA maintained business checking accounts at Wells Fargo—one for RSA Talent and one for RSA Productions. *Fisher Dep.*, pp. 84-86. Ms. Gomez and Defendant both held debit cards for these accounts. *Id*. Defendant and Ms. Gomez both unilaterally caused distributions from RSA to themselves. *Id*., pp. 126-27; *Fisher Decl.*, ¶¶ 28, 32-33.

RSA generated revenue when clients performed acting roles that were booked while they were a client of RSA. When the client earned money from such roles, RSA was entitled to a commission, the amount of which was set forth in that client's contract with RSA.

RSA received checks via mail at RSA Office's address and at Ms. Gomez's home address. Ms. Gomez processed the checks mailed to her home address. At the insistence of Ms. Gomez, commission checks from third-party vendors were sent to her home address. *Fisher Decl.*, ¶ 17.

1    RSA had a spreadsheet to track payments received (the "RSA Spreadsheet"). Defendant

2  and Ms. Gomez were both responsible for maintaining the RSA Spreadsheet. In addition to the

3  RSA Spreadsheet, RSA maintained financial records via a QuickBooks account. Ms. Gomez

4  selected the tax preparers for RSA and was the only member of RSA who communicated with

5  them. *Fisher Dep.*, pp. 109-25.

6        **C.      *The Parties' Business Relationship Breaks Down***

7              **1.      *Defendant's Audit Requests***

8        In 2021 and throughout 2022, Defendant repeatedly asked Ms. Gomez to consent to RSA

9  hiring a professional to audit its books and records. *Fisher Dep.*, pp. 128, 130; *Fisher Decl.*, ¶ 23.

10  Defendant was concerned with discrepancies she found between the RSA Spreadsheet and

11  RSA's bank statements, including overpayments to clients and undeposited checks. *Fisher Decl.*,

12  ¶¶ 18, 19, 21-22. Ms. Gomez refused to agree to Defendant's requests to have such an audit

13  conducted.

14        In early September 2022, Defendant began downloading financial records from the RSA

15  QuickBooks account so that Defendant could have them audited. *Fisher Dep.*, pp. 133-134; *Id.*, ¶

16  24. In response, Ms. Gomez changed the password. This eliminated Defendant's access to RSA's

17  QuickBooks and prevented Defendant from accessing these financial records. *Id.*; *Declaration of*

18  *Jodi Etherton*, ¶ 12 [doc. 49].

19              **2.      *Defendant's Decision to Leave RSA***

20        Defendant became increasingly frustrated with Ms. Gomez's refusal to communicate

21  with her about the issues concerning RSA's finances and its business affairs. *Fisher Decl.*, ¶ 25;

22  *Fisher Dep.*, p. 182. Defendant determined that her business relationship with Ms. Gomez was

23  beyond repair and that she had to leave RSA. *Fisher Decl.*, ¶¶ 51-52, 56.

24        On September 15, 2022, Defendant sent a text message to Ms. Gomez stating that she

25  intended to dissociate from RSA by January 1, 2023 and wanted to arrange for an audit of RSA

26  by a neutral CPA. *Text Message from Defendant to Ms. Gomez*, at pp. 480-81 [Ex. 17 to Fisher

27  Dep.]. Ms. Gomez received Defendant's text message and did not respond. Later in September

28  2022, Ms. Gomez received an email from Defendant indicating that Defendant was withdrawing

from RSA, effective immediately. Ms. Gomez then changed the login information and passwords to RSA's online accounts with Instagram and IMDb to prevent Defendant's access to those accounts.

### 3.    Ms. Gomez's Pursuit of a Restraining Order

In the evening of September 20, 2022, Ms. Gomez appeared at RSA's offices, and Ms. Gomez and Defendant had a heated argument there. *Affidavits re: Request for Restraining Order*, pp. 306-13 [Ex. 17 to Fisher Dep.]. On September 21, 2022, Ms. Gomez filed a request for a temporary restraining order against Defendant in the Superior Court of California, County of Los Angeles, to prevent Defendant from accessing the RSA Office. Although Ms. Gomez was able to obtain a temporary restraining order to prevent Defendant from entering the RSA Office, the court subsequently terminated that order. Moreover, in that action, Ms. Gomez was ordered to pay $1,500.00 as sanctions to Defendant. *Order on Respondent's Motion for Attorney's Fees and Costs*, pp. 374-77 [Ex. 17 to Fisher Dep.]; *Fisher Decl.*, ¶ 54. At trial, Ms. Gomez acknowledged that she has not paid these sanctions.

### 4.    The $2,000 Bank Account Transfers

Because Ms. Gomez was ignoring Defendant's requests to discuss RSA's finances, business affairs and client relationships, on September 22, 2022, Defendant decided to get Ms. Gomez's attention by causing an instant transfer of $2,000 from RSA Talent's checking account at Wells Fargo to Defendant's personal checking account at Wells Fargo. *Pretrial Stip.*, Section I, ¶ 13; *Declaration of Gina Nuccio Gomez* ("Gomez Decl."), ¶ 18 [doc. 46]; *Fisher Decl.*, ¶¶ 23, 25-27, 31.

Soon after Defendant made that transfer, Ms. Gomez received notice of the transaction and contacted Ms. Gilbert, informing her that Defendant stole $2,000 from RSA. *Fisher Decl.*, ¶ 29. Ms. Gilbert soon called Defendant to discuss the allegations made by Ms. Gomez; Defendant then transferred the funds back to RSA Talent's bank account. *Pretrial Stip.*, Section I, ¶ 13; *Id.*, ¶¶ 26, 29-31. Defendant did not intend to retain these funds; Ms. Gomez testified that Defendant returned these funds to RSA Talent's checking account in a few hours.

### 5.    *The Temporary Deletion of RSA's Talent Management Contracts*

In 2022, RSA began to enter its talent management contracts with existing clients into Foxit eSign ("Foxit"), a document management software program. Ms. Gomez testified that RSA stored its contracts in a Dropbox account prior to its use of Foxit. Jodi Etherton, whose five children were then clients of RSA, was paid to assist with inputting RSA's contracts into Foxit. Ms. Etherton entered RSA clients' names and addresses and a copy of their respective contract into Foxit. Once complete, Ms. Etherton would press "Send," sending a copy of the contract via email to Defendant, Ms. Gomez and the respective client.

On September 22, 2022, Defendant instructed Ms. Etherton to "delete" RSA's contracts in Foxit, after which the contracts would remain in the recycle bin. Because Defendant signed the contracts as a manager of RSA, and Defendant was leaving RSA, Defendant believed that Ms. Gomez would need to execute new contracts with RSA's clients, which did not have Defendant's name on them. Defendant testified that she also felt hurt by Ms. Gomez's comments that Defendant did nothing for RSA, when Defendant and Ms. Etherton had, among other things, input RSA's talent management contracts into Foxit. Defendant knew that Ms. Gomez could undelete the contracts. *See also Fisher Dep*., pp. 210-11, 219-22; *Fisher Decl.,* ¶¶ 37-38, 40-42, 44-45.

After the contracts were "deleted," Ms. Gomez was able to undelete the contracts by opening the contracts from the Foxit recycle bin and selecting "Undelete." Ms. Gomez testified that she also was able to access the contracts via the Dropbox account.

Moving RSA's talent management contracts to the Foxit recycle bin may have caused Foxit to send an email to one or more of RSA's clients stating that their contract had been "voided." *See Emails to and from Kari McCoy*, p. 131 [Ex. 9 to Fisher Dep.]. Defendant and Ms. Etherton did not know that moving RSA's existing contracts to the recycle bin would cause Foxit to send such an email. *Fisher Dep.*, pp. 207-08, 221-22. Ms. Etherton testified that she does not recall receiving such an email, although all five of her children were clients of RSA at that time. Nupeir Garrett, another former client of RSA, also testified that he did not receive an email stating that his contract had been "voided."

Kari McCoy, whose son then was a client of RSA, received an email from Foxit stating that his contract with RSA had been voided for the reason "moved to recycle bin." *Fisher Dep*, pp. 204-07; *Emails to and from Kari McCoy*, p. 131 [Ex. 9 to Fisher Dep.]. Ms. McCoy forwarded this email to Defendant and asked Defendant to explain it. *Emails to and from Kari McCoy*, p. 130 [Ex. 9 to Fisher Dep.]. In her reply email, Defendant noted, "I am leaving RSA and starting my own company. [Ms. Gomez] is going to have to do new contracts for RSA. If you would like to go with me, I can have my assistant contact you." *Id*. Ms. McCoy replied, "Yes, that would be great." *Id*., p. 129.

### 6.    Changes to RSA's Corporate Filings, Bank Accounts and RSA Email

On September 26, 2022, Ms. Gomez had Defendant terminated as a manager of both RSA Talent and RSA Productions. *Pretrial Stip*., Section I, ¶ 14; *Gomez Decl*., ¶ 28. That same day, Ms. Gomez filed statements of information with the California Secretary of State, which struck through Defendant's name and title as a manager and member of RSA Talent and RSA Productions. *Fisher Decl*., ¶ 36. Using the statements of information with Defendant's name struck through, Ms. Gomez then caused Wells Fargo to close RSA's business bank accounts and open new ones for which only Ms. Gomez was an authorized signatory. *Pretrial Stip*., Section I, ¶ 15; *Id.*, ¶¶ 34-36, 46, 54; *Gomez Decl.*, ¶ 29. Ms. Gomez also locked Defendant out of Defendant's RSA email account. *Fisher Decl.*, ¶ 48; *Declaration of Jodi Etherton*, ¶¶ 11-12 [doc. 49].

### D.    Formation of Untamed

On September 16, 2022, Defendant's sister, Jennifer Hunter, formed Untamed River Media and Productions LLC ("Untamed River") by filing articles of organization with the California Secretary of State. *Fisher Dep*., p. 75; *Pretrial Stip*., Section I, ¶ 10. *Fisher Decl*., ¶¶ 78-79. Defendant is the sole member of Untamed River with a 100% membership interest. *Id*. On October 1, 2022, Untamed River began operating as a talent management agency by working with writers, producers and directors. *Pretrial Stip*., Section I, ¶ 11. Untamed River operates as a talent management agency under the name Untamed Artists LA ("Untamed"). Defendant is one of seven talent managers at Untamed.

Although Defendant contributed funds to their acquisition, Defendant left RSA with almost all of its office equipment, supplies and furniture. Previously, without Defendant's approval, Ms. Gomez had removed from the RSA Office voiceover equipment which Defendant and Ms. Gomez paid equally to purchase. *Fisher Decl.*, ¶¶ 50, 53. Lastly, although Defendant contributed much of the effort for generating RSA's ongoing income while she was at RSA, i.e., residuals payable to RSA's clients, and RSA continues to collect commissions arising from work that clients did while Defendant was a manager of RSA (including clients who were on Defendant's roster), RSA has not provided any of its income to Defendant since Ms. Gomez terminated Defendant's position as a manager. *See id.*, ¶ 13.

### E.    Clients' Departures from RSA After September 2022

When Ms. Gomez and Defendant terminated their business relationship, RSA had approximately 300 active clients. *Id.*, ¶ 61. Plaintiffs contend that Defendant caused 15 of RSA's active clients to leave RSA. *Gomez Decl.*, ¶ 24. Plaintiffs have provided no testimony, financial records or other documentary evidence as to any losses of income or other monetary damages which resulted from these clients leaving RSA.

At trial, the Court heard testimony from eleven individuals who were either former clients of RSA or are parents of former clients: Starla Alford, Miles Dausuel, Jodi Etherton, Alfonso Faustino, Matthew Gademske, Nupeir Garrett, Jay Kiman, Kanthiny Nadarajah, David Robinson Jr., Gabriele Schafer and Theo Tziotzios.[5]

Each of these witnesses testified that they or their children have become clients of Defendant at Untamed. While they were clients of RSA, Mr. Dausuel, Mr. Faustino, Mr. Gademske, Mr. Robinson, Ms. Schafer, Mr. Tziotzios were on Defendant's roster. *Declaration of Matthew Gademske*, ¶¶ 3-7 [doc. 49]; *Declaration of David Robinson Jr.*, ¶ 4 [doc. 49]; *Declaration of Gabriele Schafer*, ¶ 3 [doc. 49]; *Declaration of Theo Tziotzios*, ¶¶ 4, 6 [doc. 49].[6]

---

[5] Ms. Alford and Ms. Etherton are parents of former RSA clients. *Declaration of Starla Alford*, ¶ 6 [doc. 49]; *Declaration of Jodi Etherton*, ¶ 8 [doc. 49].

[6] It is unclear whether Ms. Alford's son and Ms. Etherton's children were on Defendant's roster. However, both parents testified that they worked primarily with Defendant. *See also Declaration of Starla Alford*, ¶ 6 [doc. 49]; *Declaration of Jodi Etherton*, ¶ 3 [doc. 49].

While she was a client of RSA, although Defendant brought her to RSA, Ms. Nadarajah was placed on Ms. Gomez's roster. *Declaration of Kanthiny Nadarajah*, ¶ 5 [doc. 49].

Mr. Faustino, Mr. Gademske, Ms. Nadarajah and Ms. Schafer testified that if Defendant were still a manager at RSA, they would be interested in being a client of RSA only if they were on Defendant's roster.

Ms. Gomez testified that RSA's contracts with these former clients or their children had not expired when they left RSA.[7] In contrast, Ms. Alford testified that, prior to reconnecting as a client of Defendant, her son's contract with RSA had terminated and was no longer in effect. Mr. Tziotzios testified that his contract with RSA terminated in August 2023. Mr. Kiman's contract expired in 2024. *See Declaration of Jay Kiman*, ¶ 12 [doc. 49]. Ms. Nadarajah and Ms. Schafer each testified that they terminated their contracts with RSA before they signed with Untamed. *See also Declaration of Kanthiny Nadarajah*, ¶ 7 [doc. 49].

### 1. Clients' Knowledge of Defendant's Departure

In September 2022, Defendant informed Mr. Dausuel, Ms. Etherton and Mr. Faustino that she was leaving RSA.  Defendant noted that they (or their children) could stay with RSA and were not obligated to contract with Defendant if they left RSA. All three testified that had Defendant not contacted them first, they would have contacted her and sought to remain a client of hers.

Ms. Alford, Mr. Gademske, Mr. Garrett, Mr. Kiman, Ms. Nadarajah and Mr. Tziotzios each testified that Defendant did not contact them after she left RSA in September 2022; they contacted Defendant first. *Declaration of Kanthiny Nadarajah*, ¶ 16 [doc. 49]; *Declaration of Theo Tziotzios*, ¶ 11 [doc. 49]. Mr. Garrett testified that Ms. Gomez called to inform him of Defendant's departure. Mr. Kiman learned of Defendant's departure after seeing on IMDb that she was associated with a new talent management agency. Ms. Nadarajah learned of Defendant's departure from a former RSA client who was on Defendant's roster.

---

[7] Plaintiffs provided no other evidence to substantiate this assertion.

In September 2022, Mr. Faustino learned of Defendant's departure from RSA via a phone call from either Defendant or Ms. Gomez. On September 25, 2022, Mr. Faustino met with his attorney. *Emails to and from Alfonso Faustino*, pp. 134-35 [Ex. 11 to Fisher Dep.]. He then sent an email to Ms. Gomez and Defendant's RSA email addresses stating that he "was advised to stay with whoever is RSA.... [U]ntil there is a dissolution between [Ms. Gomez] and [Defendant], my contract is with RSA—both [Ms. Gomez] and [Defendant], as they are still RSA." *Id*. The next day, Defendant replied via email and informed him that he could be released from his contract at any time. Defendant cc'ed Ms. Gomez and others on this email. *Id*.

## 2.    Clients' Reasons for Leaving RSA

Defendant discovered Ms. Alford's son when he was 4 years old. *Declaration of Starla Alford*, ¶ 4 [doc. 49]. Ms. Alford and her son "really liked working with [Defendant] because she was always supportive" and "shares a bond" with Ms. Alford's family as they are both Native American. *Id.*, ¶¶ 5, 14. When Ms. Alford had questions, Defendant "was always the one [she] could talk to...." *Id*., ¶ 6. Ms. Alford left RSA because she found Ms. Gomez "to be very intimidating" and "made so many mistakes." *Id*., ¶¶ 7-9. Ms. Alford testified that RSA still receives the residuals for work booked before her son left RSA, although Defendant was her primary resource while he was managed at RSA.

Mr. Dausuel decided to leave RSA because Defendant "treated [him as] a dignified human being." *Declaration of Miles Dausuel*, ¶ 22 [doc. 49]. In comparison, Ms. Gomez "almost always ha[d] a very rude disposition" and "struck [him] as a person that did not really know how to talk to people." *Id.*, ¶ 16. When he told Ms. Gomez about his decision to leave RSA, Ms. Gomez stated that he "would still have to pay her commissions for [roles he] booked while signed to RSA...." *Id*., ¶ 24.

When Ms. Etherton and her children first met with Defendant and Ms. Gomez about signing on as clients of RSA, she and her children "were not particularly fond of" Ms. Gomez. *Declaration of Jodi Etherton*, ¶ 8 [doc. 49]. Ms. Etherton signed with RSA "solely due to [Defendant]'s caring, outgoing, and loving personality." *Id*. Once Defendant informed her of her departure from RSA, Ms. Etherton discussed the matter with her two older children, who both

1    indicated that they wanted to continue working with Defendant. Ms. Etherton's decision to leave

2    RSA was bolstered by her opinion that Defendant "work[s] tirelessly," is "dedicate[ed] to her

3    work and clients," and has "genuine care for [her] children...." *Id.*, ¶¶ 17-18.

4        Mr. Faustino decided to go with Defendant because she discovered him,[8] brought him on

5    as a client of RSA and "had a productive relationship [with him] during [his] stay with RSA."

6    *Declaration of Alfonso Faustino*, ¶¶ 5, 11 [doc. 49]. When Mr. Faustino discussed his decision

7    with Ms. Gomez, she told him that she understood and would take him back as a client should

8    things not work out with Defendant. *Id.*, ¶ 12; *Faustino Letter* [Ex. 15].

9        In 2024, Mr. Garrett decided to leave RSA because he was dissatisfied with Ms. Gomez's

10   services. *Declaration of Nupeir Garrett*, ¶ 4 [doc. 49]. He felt that Ms. Gomez put him "on the

11   back burner" and did not give him appropriate attention. Ms. Gomez also forgot to pay him his

12   residuals several times. *Id.*, ¶ 6. Mr. Garrett felt that Defendant "paid better attention to detail."

13   *Id.*, ¶ 5.

14       Mr. Kiman wanted to leave RSA because he "never had a good working relationship with

15   [Ms.] Gomez [and] generally found [her] to be rude, unhelpful and kind of a bully." *Declaration

16   of Jay Kiman*, ¶¶ 3-4 [doc. 49]. He "trusted and always had a terrific relationship with"

17   Defendant. *Id.*, ¶ 5. Following Defendant's departure from RSA, when he was represented solely

18   by Ms. Gomez, Mr. Kiman "knew it was time for a change of management." *Id.*, ¶ 6. Before

19   leaving RSA in late 2023 or early 2024, Mr. Kiman reached out to Ms. Gomez two to three times

20   to discuss the issues in their business relationship; Ms. Gomez never responded to him. Mr.

21   Kiman then emailed RSA to give notice of his intent to terminate his contract. Ms. Gomez

22   scheduled a meeting with Mr. Kiman to discuss his contract; she then did not appear at the

23   meeting. Nevertheless, Ms. Gomez stated that "she could not let [him] out of [his] contract [with

24   RSA] until things with [Defendant] were settled...." *Id.*, ¶ 8.

25

26

27   _____

28   [8] After Defendant saw him perform in a play at the Beverly Hills Playhouse and asked if she could represent him,
     Mr. Faustino became a client of RSA. *Declaration of Alfonso Faustino*, ¶¶ 3-5 [doc. 49]. After talking with several
     other managers who asked to represent him, Mr. Faustino "made [his] decision to work with" Defendant. *Id.*, ¶ 5.

1    During the three months between Mr. Kiman's initial attempts to reach Ms. Gomez and

2    when his contract with RSA expired, RSA did not secure any auditions for him. After leaving

3    RSA, Mr. Kiman worked with a talent manager other than Defendant for a few months. *Id*., ¶¶ 7,

4    14.

5    In April 2023, Ms. Nadarajah decided to leave RSA because Ms. Gomez "frequently

6    ignored [her] emails and requests for updates, leaving [her] feeling isolated and unsupported in

7    [her] career endeavors." *Declaration of Kanthiny Nadarajah*, ¶ 6 [doc. 49]. Ms. Nadarajah was

8    dissatisfied with Ms. Gomez's professional advice; Ms. Nadarajah also was unhappy that, during

9    one year as a client with RSA, she only had four auditions. When Ms. Nadarajah told Ms.

10    Gomez that she intended to leave RSA, Ms. Gomez "responded with a barrage of aggressive

11    emails and phone calls" in which she criticized Ms. Nadarajah's audition materials and told her

12    that she "lacked talent altogether." *Id*., ¶¶ 7-8. After Ms. Gomez told Ms. Nadarajah that she

13    could not terminate her contract with RSA, Ms. Nadarajah had an attorney review her contract,

14    and she informed Ms. Nadarajah that she could terminate it.

15    In August 2023, Mr. Robinson emailed a voiceover audition to Ms. Schultz. *Declaration

16    of David Robinson Jr.*, ¶¶ 7-8 [doc. 49]; *Letter from David Robinson Jr.*, pp. 378-79 [Ex. 14]. In

17    her reply, Ms. Schultz asked, "are you rep'd by [Defendant]... in any capacity?" *Id*. Mr.

18    Robinson responded that Defendant was helping him with projects which were not related to

19    voiceover work. *Id*. After he sent this response to Ms. Schultz, Mr. Robinson stopped receiving

20    communications and voiceover auditions from RSA. *Declaration of David Robinson Jr.*, ¶¶ 9-10

21    [doc. 49]. In fact, Mr. Robinson believed RSA had dropped him as a client. *Id.*, ¶ 11.

22    After Defendant left RSA, Ms. Schafer also left RSA. Ms. Schafer had "stayed with RSA

23    because of" Defendant; she did not have a "meaningful working relationship with" Ms. Gomez.

24    *Declaration of Gabriele Schafer*, ¶¶ 3, 5 [doc. 49]. She found Ms. Gomez to be "difficult to

25    communicate with" and stated that Ms. Gomez "showed minimal interest in helping [her] be at

26    [her] best professionally." *Id*., ¶ 4. Ms. Schafer thought Defendant "was the opposite" and was

27    "hands on with [her] acting career and believed in [her] potential." *Id*., ¶ 5.

28

### F.       The State Court Action

On November 18, 2022, Ms. Gomez, RSA Productions and RSA Talent (collectively, "Plaintiffs") filed a complaint against Defendant in the State Court. The asserted causes of action included breach of contract, breach of fiduciary duty and interference with contractual relationships. *Pretrial Stip.*, ¶ I.9; *Gomez Decl.*, ¶ 30; *Complaint in State Court Action*, pp. 5-81 [Ex. 1 to Fisher Dep.]. Defendant filed a cross-complaint against Plaintiffs in the State Court for the same causes of action. *Cross-Complaint in State Court Action*, pp. 109-20 [Ex. 4 to Fisher Dep.].

### G.       The Bankruptcy Case

On August 23, 2023, Defendant filed a chapter 7 petition. In her schedule A/B, Defendant noted that she holds a 100% ownership interest in Untamed River, with a value of $10,000. The assets of Untamed River "include small client list / computer and equipment / trade secrets & films / accounts receivable commissions, Wells Fargo etc." In her schedule C, Defendant claimed an exemption in her interest in Untamed River under Cal. Civ. Proc. Code § 704.060.

### H.       The Adversary Proceeding

On November 28, 2023, Plaintiffs filed a complaint against Defendant (the "Complaint"), initiating this adversary proceeding. In the Complaint, Plaintiffs sought a determination of nondischargeability as to debts owed to them for: (1) larceny under 11 U.S.C. § 523(a)(4); (2) embezzlement under 11 U.S.C. § 523(a)(4); and (3) willful and malicious injury under 11 U.S.C. § 523(a)(6).

On December 20, 2023, Defendant filed a motion to dismiss the Complaint (the "Motion to Dismiss") [doc. 5]. On January 31, 2023, the Court granted in part and denied in part the Motion to Dismiss. *Court's Ruling* [doc. 14]; *Order* [doc. 17]. The Court dismissed without leave to amend Plaintiffs' claim for larceny under 11 U.S.C. § 523(a)(4) and dismissed with leave to amend Plaintiffs' claim for embezzlement under 11 U.S.C. § 523(a)(4).

On February 27, 2024, Plaintiffs filed a *First Amended Complaint* (the "FAC") [doc. 19] for a determination of nondischargeability of debts owed to them under 11 U.S.C. § 523(a)(6).

## II.    LEGAL STANDARDS

The plaintiff's burden of proof in a nondischargeability action under 11 U.S.C. § 523(a) is "the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

### A.    11 U.S.C. § 523(a)(6)

11 U.S.C. § 523(a)(6) provides that a discharge under § 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The "willful" and "malicious" requirements are conjunctive and subject to separate analysis. *In re Sicroff*, 401 F.3d 1101, 1105 (9th Cir. 2005).

#### 1.    Willfulness

A "willful" injury is a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). Debts "arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64. It suffices, however, if the debtor knew that harm to the creditor was "substantially certain." *In re Su*, 290 F.3d 1140, 1145-46 (9th Cir. 2002); *In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001) ("[T]he willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct.") (emphasis in original).

In *In re Ormsby*, 591 F.3d 1199 (9th. Cir. 2010), the debtor had copied and used a competing title company's proprietary information surreptitiously and without paying for it. *Id.* at 1204, 1206-07. In order to obtain that proprietary information, the debtor colluded with a current employee of the competitor, who stole the information and subsequently left to join the debtor's company. Because of the debtor's actions, the competing title company incurred financial damages in the amount of $141,500. *Id.* at 1207. The Court of Appeals concluded that the debtor believed that the competing title company's injury was substantially certain to occur; the debtor knew that his use of the competing title company's proprietary information without paying for it had an economic value. *Id.*

In *Jercich*, the Ninth Circuit Court of Appeals evaluated whether an employer who did not pay wages to an employee had acted "willfully," within the meaning of § 523(a)(6). The state court had found that the debtor: (1) knew he owed wages to the plaintiff; (2) had the ability to pay the wages; and (3) knew that injury to the plaintiff was substantially certain to occur if the plaintiff did not receive his wages. *Id.*, 238 F.3d at 1208–09. The Court of Appeals held that this conduct of the debtor-employer met the willfulness requirement of § 523(a)(6).

### 2.    Maliciousness

"[T]he 'malicious' injury requirement of § 523(a)(6) is separate from the 'willful' requirement." *Su*, 290 F.3d at 1146. Maliciousness requires (1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; (4) without just cause or excuse. *Id*. at 1147.

"[T]he 'done intentionally' element of a 'malicious' injury brings into play the same subjective standard of intent which focuses on the [tortfeasor]'s knowledge of harm to the creditor." *In re Thiara*, 285 B.R. 420, 434 (B.A.P. 9th Cir. 2002); *see also Jercich*, 238 F.3d at 1209. This definition "does *not* require a showing of biblical malice, i.e., personal hatred, spite, or ill-will." *In re Bammer*, 131 F.3d 788, 791 (9th Cir. 1997) (emphasis in original).

### B.    Conversion

"Conversion is the wrongful exercise of dominion over the property of another." *Burlesci v. Petersen,* 68 Cal.App.4th 1062, 1066, 80 Cal.Rptr.2d 704 (Cal. Ct. App. 1998)). "The elements of conversion are (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages." *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003). "A conversion, under California law, ... does not necessarily decide the type of wrongful intent on the part of the debtor that is necessary for the damages to be a nondischargeable debt under § 523(a)(6)." *Thiara*, 285 B.R. at 427 (citing *In re Peklar*, 260 F.3d 1035, 1037-39 (9th Cir. 2001)) (internal quotations omitted).

### III.    ANALYSIS

In the FAC, Plaintiffs allege that Defendant's debt is nondischargeable pursuant to § 523(a)(6). Plaintiffs did not establish that Defendant's actions were willful, that they were

malicious or that they caused injury to Plaintiffs. Taking into account the facts of this case, Plaintiffs have not cited to, and the Court is unaware of, any legal authority that supports the proposition that a determination of nondischargeability of debt under § 523(a)(6) is appropriate.[9]

### A.    Defendant's Alleged Competition with RSA

Plaintiffs argue that in leaving RSA, Defendant was prohibited from working with any clients of RSA ever again—even if such clients were brought to RSA by Defendant, were on Defendant's roster or primarily worked with her while at RSA. Plaintiffs further argue that Defendant willfully and maliciously injured Plaintiffs by working with former clients of RSA following her departure. Plaintiffs' position essentially is that Defendant should not have left RSA. Plaintiffs made this argument even though Ms. Gomez: (1) refused to permit an audit of RSA's books and records, (2) prevented Defendant from accessing RSA's financial records and social media accounts, (3) refused to communicate with Defendant, (4) obtained a temporary restraining order to prevent Defendant from entering the RSA Office, (5) terminated Defendant as a manger of RSA, (6) closed RSA's business bank accounts and (7) locked Defendant out of Defendant's RSA email account.

### 1.    Willfulness

Plaintiffs did not show that Defendant's subjective motive was to inflict injury on them. Unlike in *Ormsby* where the debtor copied a competitor's proprietary information surreptitiously and without paying for it, Defendant kept Ms. Gomez apprised of her actions after leaving RSA by cc'ing Ms. Gomez on emails to former clients. *See* 591 F.3d at 1204, 1206-07. Additionally, Defendant left RSA with almost all of its office equipment, supplies and furniture, although she had contributed funds to buying them for RSA. Defendant also has not received any income from

---

[9] Plaintiffs cite *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–74, 133 S. Ct. 1754, 1759, 185 L. Ed. 2d 922 (2013) for the proposition that if "the Court finds that [Defendant]'s conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, [the Court] will assuredly find that [Defendant] committed an intentional wrong." *Plaintiffs' Trial Brief*, p. 10:16-18 [doc. 45]. However, *Bullock* is inapposite; that case concerned a claim for relief for nondischargeability of debts related to "defalcation while acting in a fiduciary capacity" under 11 U.S.C. § 523(a)(4). The Court previously dismissed Plaintiffs' claims under § 523(a)(4) [docs. 14, 17]. The FAC does not contain a claim under § 523(a)(4). In any event, Plaintiffs did not raise or prove the requisite elements for a claim under § 523(a)(4). *See In re Niles*, 106 F.3d 1456, 1459 (9th Cir. 1997) (describing the elements of § 523(a)(4) as being met "where (1) an express trust existed, (2) the debt was caused by fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created.").

1  the commissions that RSA continues to collect from work that clients did while Defendant was a

2  manager of RSA—including clients who were on Defendant's roster.

3      In leaving RSA, Defendant did not intend to injure RSA; she intended to remove herself

4  from an abusive and unworkable business relationship with Ms. Gomez. Moreover, Plaintiffs did

5  not show that Defendant believed injury was substantially certain to occur as a result of her

6  Defendant leaving. Following Defendant's departure, RSA retained: (1) nearly all of its clients;

7  and (2) future revenues generated from work any of its clients had booked while Defendant was

8  a talent manager at RSA. When clients left RSA, it often was because they were dissatisfied with

9  Ms. Gomez's services in comparison to the efforts that Defendant made when Defendant was

10  with RSA. Stated differently, RSA's loss of clients was a result of Ms. Gomez's conduct.

11          ***2.      Maliciousness***

12      Plaintiffs have not proven the requisite elements to establish that Defendant's alleged

13  competition with RSA was malicious. Plaintiffs have not proven that Defendant's conduct was a

14  "wrongful act done intentionally" because, as analyzed above, Defendant did not subjectively

15  intend to injure Plaintiffs.

16      Even assuming Plaintiffs could establish Defendant's intent, Plaintiffs presented no

17  evidence to prove that Defendant's alleged competition with RSA "necessarily caused injury" to

18  Plaintiffs. In general, Plaintiffs offered no evidence establishing the amount of the debt that

19  Defendant purportedly owes them. Plaintiffs did not submit any evidence of financial damages

20  purportedly caused by Defendant's departure from RSA, such as any loss in revenues.

21      Plaintiffs have not demonstrated that clients who left RSA were contractually obligated to

22  remain clients of RSA when they left. Ms. Gomez testified that RSA's contracts with each of

23  such former client had not expired when they left RSA. However, Ms. Gomez is not a credible

24  witness. Many of the former clients testified that their contracts had terminated.

25      Even if valid contracts did exist, Defendant notified few clients about her intended

26  departure from RSA. All three testified that had Defendant not contacted them first, they would

27  have contacted her and sought to remain a client of hers. The remaining former clients each

28  testified that they were the ones to reach out to Defendant following her departure. Regarding the

former clients whom Defendant contacted about her "split up" from Ms. Gomez, she told each of them that they could stay with RSA. Finally, many of these former clients of RSA left because they were unsatisfied with Ms. Gomez's services or were disgruntled with her unpleasant behavior. Defendant did not cause the former clients to leave RSA; Ms. Gomez did.

Many former clients testified that they did not book any roles while clients of RSA. For the few who did, they testified that RSA still receives commissions for roles they booked while they were clients of RSA. Plaintiffs did not demonstrate that any loss took place because of these clients' decision to leave RSA. Plaintiffs offered no evidence concerning the value of such clients' contractual relationship with RSA.

For the former clients who stayed with RSA for a significant amount of time after Defendant's departure, they testified that RSA was not actively working with them and booking roles for them. Many complained that RSA did not book any auditions for them or that RSA booked only a few. One former client, Mr. Robinson, believed that he had been dropped by RSA.

Furthermore, Ms. Gomez drove Defendant out of RSA when she, among other actions: (1) refused to permit an audit of RSA's books and records, (2) prevented Defendant from accessing RSA's financial records and social media accounts, (3) refused to communicate with Defendant, (4) obtained a temporary restraining order to prevent Defendant from entering the RSA Office, (5) terminated Defendant as a manger of RSA, (6) closed RSA's business bank accounts, and (7) locked Defendant out of Defendant's RSA email account. Ms. Gomez's actions suggest an intent to harm Defendant rather than to protect RSA's business interests.

### B.    The Temporary "Deletions" of RSA's Talent Management Contracts from Foxit

Defendant's conduct in instructing Ms. Etherton to move all of RSA's contracts in Foxit to the recycle bin on September 22, 2022, is not a willful and malicious injury within the meaning of § 523(a)(6).

### 1.    Willfulness

Plaintiffs did not show that Defendant's subjective motive was to inflict injury on them. By deleting these contracts, Defendant's intention was to cause Ms. Gomez a minor inconvenience, in response to Ms. Gomez's mistreatment of Defendant. Defendant also believed

that, because Defendant signed the contracts as a manager of RSA, Ms. Gomez would need to execute new contracts with RSA's clients without Defendant's name on them. Because of Defendant's withdrawal from RSA, Defendant believed that it was improper for the contracts to include her name on them.

Plaintiffs also did not show that Defendant believed that injury was substantially certain to occur as a result of her conduct. Defendant was aware that Ms. Gomez could undelete the contracts and that they would still be accessible via the Dropbox account. In fact, Ms. Gomez ultimately did undelete the contracts in Foxit. Before the contracts were undeleted from Foxit, Ms. Gomez was able to access the contracts via the Dropbox account. Defendant knew that causing the contracts to be deleted would *not* injure Plaintiffs.

### 2.      *Maliciousness*

Plaintiffs have not proven the requisite elements to establish that Defendant's conduct was malicious. Plaintiffs have not proven that the contract deletions were a "wrongful act done intentionally" because, as analyzed above, Defendant did not subjectively intend to injure Plaintiffs. Even assuming Plaintiffs could establish Defendant's intent, as discussed above, Plaintiffs presented no evidence to prove that Defendant's purported interference with RSA's contracts "necessarily caused injury" to Plaintiffs.

### C.      *The $2,000 Bank Transfers*

Defendant's transfer of $2,000 from RSA Talent's bank account on September 22, 2022, is not a willful and malicious injury within the meaning of § 523(a)(6).

### 1.      *Willfulness*

Defendant's motive in causing the transfer was to get Ms. Gomez's attention after Ms. Gomez had been unresponsive to Defendant for several days. As soon as Ms. Gilbert called and contended that Defendant stole $2,000 from RSA, Defendant deposited the funds back into RSA Talent's bank account (that same day). Accordingly, Plaintiffs did not show that Defendant's subjective motive was to inflict injury on them. *See Jercich*, 238 F.3d at 1208.

Plaintiffs also did not show that Defendant believed that injury was substantially certain to occur as a result of her conduct. Defendant made the withdrawal in the form of an instant

transfer from RSA Talent's checking account at Wells Fargo to Defendant's personal checking account at Wells Fargo. She deposited the $2,000 in the same manner. Defendant knew that, as an internal transfer, the funds would be made available to RSA within minutes from when Defendant initiated the deposit. Defendant knew that the transfer would not injure Plaintiffs.

### 2.    *Maliciousness*

Plaintiffs have not proven the requisite elements to establish that Defendant's conduct was malicious. As analyzed above, Plaintiffs have not proven that the $2,000 transfer was a "wrongful act done intentionally" because the evidence shows that Defendant did not subjectively intend to injure Plaintiffs.

Moreover, Plaintiffs have not shown that the $2,000 transfer "necessarily caused injury" to them. The only testimony Plaintiffs offered regarding financial harm that RSA suffered was that of Ms. Gomez, who stated that the withdrawal brought the account balance to around $100 and that, as a result, RSA was unable to pay its creditors. Ms. Gomez's testimony is not credible. The $2,000 was out of RSA Talent's bank account for a few hours. Plaintiffs offered no evidence of any such creditors that they were unable to pay during the period where the $2,000 was withdrawn.

### 3.    *Conversion*

Defendant's transfer of $2,000 from RSA Talent's bank account is not a conversion under California law because, as analyzed above, Plaintiffs suffered no damages from the transfer. Plaintiffs also did not establish that Defendant's transfer of the $2,000 was wrongful or inconsistent with the property rights of RSA Talent. In the normal course of RSA's business, Defendant and Ms. Gomez both unilaterally caused distributions from RSA to themselves. Even if Defendant's transfer was a conversion, as analyzed above, Plaintiffs have not established that Defendant committed it with the type of wrongful intent necessary under § 523(a)(6).

### 4.    *Cal. Corp. Code § 17704.05(a)*

Plaintiffs argued that the $2,000 transfer was a distribution to Defendant that left RSA unable to pay its debts as they became due in violation of Cal. Corp. Code § 17704.05(a). Plaintiffs have not demonstrated how RSA Talent suffered from potential insolvency or was

1  unable to "pay its debts as they became due." Moreover, Plaintiffs have not established that any

2  injury resulted from the $2,000 transfer, which Defendant quickly reversed.

3  **IV.    CONCLUSION**

4      The Court will enter judgment in favor of Defendant. Defendant must submit a proposed

5  judgment within seven (7) days.

6                                    # # #

Date: April 4, 2025

Victoria S. Kaufman
United States Bankruptcy Judge

-23-